UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PHILLIP WAYNE HARDY,

        Petitioner,

                             CASE NO. 1:12-CV-15329
v.                          JUDGE THOMAS L. LUDINGTON
                             MAGISTRATE JUDGE PAUL J. KOMIVES

ROBERT NAPEL,

        Respondent.

_____/


## REPORT AND RECOMMENDATION ON PETITIONER'S HABEAS APPLICATION (docket #1) and PETITIONER'S MOTION FOR BOND (docket #15)

*Table of Contents*

| | | |
|---|---|---:|
| I. | RECOMMENDATION ................................................................ | 2 |
| II. | REPORT ........................................................................ | 2 |
| | A.    *Procedural History* ...................................................... | 2 |
| | B.    *Factual Background Underlying Petitioner's Conviction* ............................. | 3 |
| | C.    *Standard of Review* ..................................................... | 21 |
| | D.    *Ineffective Assistance of Counsel* ......................................... | 24 |
| |      1.    *Clearly Established Law* ............................................. | 24 |
| |      2.    *Analysis* .......................................................... | 26 |
| |          a. Failure to Call Witnesses ....................................... | 26 |
| |          b. Failure to Seek Severance ....................................... | 29 |
| | E.    *Joint Representation* .................................................... | 32 |
| |      1.    *Clearly Established Law* ............................................. | 32 |
| |      2.    *Analysis* .......................................................... | 33 |
| | F.    *Motion for Bond* ....................................................... | 34 |
| | G.    *Recommendation Regarding Certificate of Appealability* ........................... | 37 |
| |      1.    *Legal Standard* .................................................... | 37 |
| |      2.    *Analysis* .......................................................... | 38 |
| | H.    *Conclusion* ............................................................ | 39 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS .................................... | 39 |

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.  The Court should also deny petitioner's motion for bond.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Phillip Wayne Hardy is a state prisoner, currently confined at the Marquette Branch Prison in Marquette, Michigan.

        2.      On November 5, 2009, petitioner was convicted of two counts of second degree child abuse, MICH. COMP. LAWS § 750.136b(3), following a jury trial in the Tuscola County Circuit Court. On January 19, 2010, he was sentenced to concurrent terms of 18-48 months' imprisonment on each count.

        3.      Following his conviction, petitioner filed a motion for new trial in the trial court, alleging that counsel provided constitutionally ineffective assistance in several respects.  Following a two-day evidentiary hearing, the trial court granted petitioner's motion for new trial, concluding that counsel was ineffective for failing to investigate and present various witnesses.

        4.      Following the trial court's ruling, both the prosecutor and petitioner filed appeals in the Michigan Court of Appeals.  The prosecutor claimed that the trial court had erred in finding counsel ineffective for failing to investigate and call as witnesses petitioner's older son and his employer.  Petitioner claimed that the trial court had erred in not also finding (1) that counsel was ineffective for failing to seek severance of his trial from that of his wife, and (2) that he was denied his right to counsel by the joint representation by counsel of both he and his wife.  The Michigan Court of Appeals reversed the trial court's grant of a new trial, rejected petitioner's claims, and

remanded for reinstatement of petitioner's convictions and sentences. *See People v. Hardy*, No. 296509, 2011 WL 4810772 (Mich. Ct. App. Oct. 11, 2011) (per curiam).

5.      Petitioner sought leave to appeal in the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Hardy*, 491 Mich. 909, 810 N.W.2d 915 (2012).

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 4, 2012. As grounds for the writ of habeas corpus, he contends that counsel was ineffective for (1) failing to investigate and present witnesses, and (2) not seeking severance of his trial. He also contends that he was deprived of his right to counsel by the joint representation of he and his wife by trial counsel.

7.      Respondent filed his answer on June 7, 2013. He contends that petitioner's claims are without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the abuse of his adopted minor children, Phillip and Elizabeth. Petitioner was tried jointly with his wife, who was convicted of the same charges and received the same sentence. The evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Court of Appeals, as set forth in respondent's Answer:

> On November 21, 2001, Phillip and Elizabeth were removed from their biological mother. (II, 147-148). On November 26, 2001, Elizabeth was moved to Phillips' foster home. (II, 148). On December 18, 2001, Phillip was moved to a third foster home. (II, 148). The children would have been examined by a doctor within 30 days because it was policy. (I, 162). At the time they were removed, Phillip was "hyper", but Elizabeth was an infant and had no behavioral issues. (I, 152).
> On January 25, 2002, 4-year-old Phillip was placed with Defendants and 2-year-old Elizabeth followed on April 22, 2002. (II, 149-150, 161). Defendants received a subsidy to care for the children, which continued even after they adopted. (II, 150).

On November 18, 2008, Department of Human Services (DHS) Children's Protective Services (CPS) worker Dana Price received a referral that the children had run away from home and were going to the neighbors, asking to cook food and bringing popcorn with them. (I, 153, 165, 167). Price was aware of earlier complaints and CPS' investigations, but she was not personally involved in them. (I, 164). The children were the subject of one of those complaints and other children in Defendants' home were the subject of another. (I, 179).

The following day, Price received two additional referrals. (I, 153, 167). Price, accompanied by Michigan State Police Trooper Jennifer Coulter, went to Defendants' house. (I, 153; II, 19, 53). Price told Coulter that she had received numerous referrals about the children from the neighbors that they were asking for food. (II, 52). The neighbors were concerned that the children were not eating. (II, 52). In addition, when Kingston Police Department Chief Lich returned the children, he smelled a strong odor of feces and from what he could see from the doorway, "the house was extremely filthy." (II, 52).

When they arrived, the children were with Phillip Hardy. (I, 153; II, 20). Price smelled an odor akin to dog feces. (I, 155). Phillip Hardy did not let them in and came outside, closing the door, claiming that the dog inside bit. (II, 54). Phillip Hardy was aware that the children had run away, noting that they had been returned and disciplined. (I, 154). Phillip Hardy told Coulter that the children were left alone "occasionally" when he had to go to work and Sheila had not yet returned home. (II, 20). Price also recalled Phillip Hardy confirming that the children were left alone after he went to work and before Sheila returned. (I, 154).

Coulter explained to Phillip Hardy that she wanted to interview the children separately so that they would not repeat back what they had heard the other one say. (II, 40, 55-56). When Phillip Hardy did not volunteer the use of one of his home's rooms, Coulter asked if the children could see the police car and be interviewed there. (II, 30-31, 40, 55-57). Phillip begged to go. (II, 57).

Coulter, who used the forensic interviewed protocol, talked to Phillip as Price took notes and, eventually, asked questions herself. (I, 154, 171-173, 181; II, 31). Phillip told Coulter that he ran away because Elizabeth had begged him to because she was hungry and was throwing up water, explaining that she had not eaten for five days. (II, 34-36, 60). Phillip reported that was not the first time Elizabeth had gone several days without eating. (II, 36). Elizabeth didn't get food because she had not completed her timeouts from failing to do her "paces" or homework. (II, 35-36). Elizabeth's timeouts lasted for nine minutes because she was nine. (II, 35). Phillip stated that they could get 25 timeouts in a day. (II, 35-36, 61). Phillip kicked a hole in the door. (II, 35). Elizabeth crawled out and, then, let him out. (II, 35). They went to the neighbors and the woods. (II, 35). According to Phillip, they were locked in the room "all the time" so that they didn't get into the food they were not supposed to have. (II, 36). Phillip went to the bathroom on the floor or in his pants if he could not hold it. (II, 37-38). Phillip had been sharing a bedroom with Elizabeth until a few days earlier when their older brother Rick left. (II, 37). Phillip Hardy would spank them with a belt because Sheila did not like to do it. (II, 38).

4

Elizabeth also told Coulter that they ran away because she was hungry, hadn't eaten in several days and was throwing up water. (II, 39, 43). She didn't get to eat because she had not completed her timeouts. (II, 39, 42). She had 9-minute time outs and could get 25 a day. (II, 39-40, 42). When they were locked in the room and had to go to the bathroom, they would knock. (II, 41). If no one heard them, they would go on the floor or wet their pants. (II, 41-42).

Elizabeth confirmed that Phillip had kicked a hole in the locked door. (II, 40). She crawled out and, then, pulled up a chair to unlock the door for Phillip. (II, 40). Like Phillip, Elizabeth reported being locked in "all the time." (II, 41). Elizabeth further reported that they were spanked for running away. (II, 41). They were also spanked for wetting their pants. (II, 41). Phillip Hardy spanked them with a belt. (II, 41).

The following day, Price, who had an order to pick up the children, returned with Trooper Coulter and Trooper James Horn. (I, 155; II, 6-7, 14). Sheila Hardy (Sheila) was home and had no reaction to the order. (I, 155, 169; II, 43, 53). Trooper Coulter asked for clothes for the children and Sheila got a bag and began to walk around the house. (II, 44). Trooper Coulter asked if she could show her Elizabeth's room and Sheila did so, explaining that Phillip's bedroom was down the hall and that they had just moved him to Ricky's former room. (II, 44). Sheila reported they were making some repairs to Phillips' room. (I, 169). However, Coulter did not see any building materials in the home and Horn did not recall seeing any. (II, 14-15, 65).

According to Coulter, Sheila admitted that the children were left home alone, but stated that it was only for short periods of time. (II, 44). Price recalled Sheila stating that it was "only a couple of times." (I, 159). Sheila claimed that the children had a cell phone. (II, 44). Sheila further admitted that the children were locked in the room because "they destroy things and get into things that they can't have." (II, 45).

Sheila showed them Elizabeth's bedroom, which only had a few things inside. (I, 156-157, 179). A broken laundry basket at the end of the bed had some toys on it. (II, 46). Appendix A. As Price entered Elizabeth's room, she was met with "a strong odor of urine[,]" confirming Elizabeth's claim that she had urinated there. (I, 157, 169-170, 183). Horn noticed the same odor and, in fact, Coulter put her coat over her face before she entered. (II, 12, 46, 66). Price also reported the odor coming from a rusted metal trash can. (II, 12). The mattress was "very soiled" and "worn out." (II, 12). The drywall was damaged with holes and the insulation was visible. (I, 157; II, 11, 17, 46). Appendix A. There was writing on the ceiling. (II, 13). The door going into the bedroom had a hole kicked in the bottom of it consistent with the children's claims that they had kicked a hole in it in order to get out and get food. (I, 157, 183). Appendix A. The double-paned window was covered with a board except for a small section at the top. (I, 157, 179; II, 11-12, 46). Appendix A. The floor had decaying dark blue carpet on it, but it appeared brown and dirty. (I, 157; II, 11, 46). The floor sagged and was "soft" and "squishy," making Horn concerned that he might fall through. (I, 158; II, 13, 46). The heating vent had been boarded over so that no heat entered. (I, 157, 179; II, 11-12, 46). Appendix A. The home was heated using a wood stove. (II, 65). There was also "a new alarm" for the door and "several

other holes where" an earlier locking device had been removed. (I, 157; II, 12, 45). Appendix A. Phillip told them that Phillip Hardy had put a new alarm on the door and removed the old bolt lock. (I, 183).

There were dirty dishes all over the house and the orange cat was crawling everywhere. (II, 14, 45, 53). Defendants also had a kennel out back with at least three dogs. (II, 14, 53). Appendix A.

Coulter recalled the bathroom being down the hall. (II, 65). And, Horn also believed that Elizabeth's bedroom was not adjacent to the bathroom. (II, 15).

Horn took photographs of Defendants' home that are attached as Appendix A; some of them were not admitted because they contained writing. (II, 8-9, 219-222).

The police later found the children with Phillip Hardy at Osborne Realty. (II, 46-47).

Twelve-year-old Phillip testified that he was in the fifth grade and had ADHD. (I, 185, 220). Phillip saw a doctor and had prescriptions for Risperdal, a sleeping pill and, perhaps, Adderall. (I, 219-221). Phillip attended public school, but had a special education teacher. (I, 204, 228).

In 2008, Phillip lived with Elizabeth, Defendants, and his older brother Rick. (I, 187, 213). Phillip also had an older brother Thomas, who had moved out. (I, 187). Rick, who was 18, moved out in 2008, and joined the Army after a dispute with Defendants. (I, 187, 198). At about the same time Rick left, Defendants talked to Phillip about staying home for an hour or two with Elizabeth because their work shifts overlapped. (I, 222-223).

The first day Phillip was alone with Elizabeth was a day or two before the door kicking. (I, 223-224). Elizabeth was hungry and called for pizza, even though Phillip told her that they had no money. (I, 223-224, 232). That happened on the day that Phillip Hardy took Rick to join the Army. (I, 232).

Phillip and Elizabeth shared a bedroom. (I, 188). The room was "a mess" because it had holes in the wall and boards over the windows. (I, 196, 217). The children had earlier broken the window at Rick's instigation so that Elizabeth could go down into the basement to get food for him. (I, 218). Both children had cut themselves breaking the window. (I, 218-219). Then, Rick told Defendants. (I, 218-219). Elizabeth had also jumped out the window and run off. (I, 201-202). Elizabeth told Phillip that "nobody cared about her." (I, 201). Phillip told her that if Defendants didn't care, they wouldn't have adopted her. (I, 201). Phillip had broken the window twice earlier, once accidentally. (I, 219). Phillip Hardy had repaired the window twice. (I, 219).

The reason that there was a board on the heating vent was that Rick had carved a larger hole with his pocketknife so that Elizabeth could go down into the basement and retrieve food for him. (I, 197, 208-209, 224-225, 235-237). Appendix A. Defendants had frozen meat and low-fat cereal in the basement. (I, 208-209). There was no food in the refrigerator. (I, 225).

When Sheila went to work at 5 p.m., she locked the children in the room. (I, 189, 193, 200). Phillip Hardy did not come home until 11 p.m. (I, 189, 193).

Sheila also locked them in the room when she wanted to sleep. (I, 193, 200-201). At times, they were locked in for the day. (I, 193, 226). When that happened, they had to urinate in the room. (I, 193-194). If Phillip Hardy heard their knocks, he would let them use the restroom; but, if he did not, they did what they had to do. (I, 194). They did it "a lot." (I, 194). When Rick babysat, they could also be locked in their room if they "acted up." (I, 200, 225, 233).

Sheila home schooled the children. (I, 191, 205). They had to do their homework or "paces." (I, 191, 194). They also had timeouts and chores. (I, 191). The length of the timeout was equal to the child's age. (I, 195). If they didn't get their homework, timeouts and chores done, they got less food or no food. (I, 191, 194). Timeouts were also given for fighting or not listening or for taking things. (I, 195).

They might take cereal or peanut butter from Defendants' bedroom. (I, 207). Sheila had trail mix or "Christmas food." (I, 208). Defendants kept lunch meat, bananas, and milk in a cooler in their bedroom. (I, 208). Defendants' bedroom was locked. (I, 208). The longest Phillip had gone without food was two days. (I, 191).

If they were really good, they would get to eat a normal dinner with Defendants at the table. (I, 206). Otherwise, they would eat a sandwich in their room or, if they were in trouble, they would get locked in. (I, 207).

Phillip Hardy also spanked the children with his hand or a belt he kept in his room. (I, 195-196, 227). Again, the number of belt strikes was equal to the child's age. (I, 196). The children would get spanked if they took something that wasn't theirs or if they jumped out the window. (I, 203). It hurt a lot to be spanked and it made Phillip cry. (I, 203). After the spankings, Phillip Hardy would hug them and tell them that he loved them. (I, 227). He would then explain what they had done wrong, what rule they had broken and why it was important to follow the rules. (I, 227). Phillip was only hit with the belt two or three times. (I, 228).

According to Phillip, Elizabeth had not done her homework and her timeouts and, therefore, Defendants told her that she couldn't eat. (I, 188, 191). Elizabeth still refused and had not eaten since Monday – five days earlier. (I, 190-191, 226-227, 230). Elizabeth was throwing up water because she could drink, but not eat. (I, 190, 230). Phillip was worried. (I, 230). Elizabeth "was really hungry" and "wanted to get out of the room." (I, 192). Phillip helped her get out by kicking a hole in the door. (I, 188, 192, 230-231). After Phillip put a hole in the door, Elizabeth crawled out and unlocked the door, allowing Phillip to leave as well. (I, 192).

Elizabeth took food from Defendants' bedroom and Phillip told her to put it back, but she said that they would never know. (I, 231). Elizabeth told Phillip that she did not like it there and came up with the idea that they should run away. (I, 188, 231). Phillip tried to warn her against it, but she stated that she would tell them that he had kicked the hole in the door and that they could just tell Defendants that they simply wanted to go outside. (I, 188). She also told Phillip that she was scared to go alone. (I, 231).

They went outside and through the neighborhood, taking popcorn and other food from Defendants' bedroom with them. (I, 188, 225-226, 234). Elizabeth wanted to sell the popcorn so that they could get money to buy candy. (I, 231). They ran out

7

of popcorn and some of the food they had taken was bad so they also asked the neighbors for food. (I, 234).

Eventually, they were returned to Defendants and grounded to their room. (I, 214). Phillip Hardy put a board over the hole in the door so that they couldn't kick it and get out again. (I, 214). Appendix A. Defendants also put an alarm lock on the door. (I, 198-199).

However, Phillip also testified that on that same day, Defendants decided that the children could go to Phillip Hardy's office. (I, 214). They were allowed to use the bathroom and Phillip Hardy offered them hot chocolate. (I, 215). Phillip Hardy then took them to McDonald's for breakfast. (I, 215, 230). They saw the police in Phillip Hardy's office parking lot. (I, 215). For lunch, they had pickled baloney and crackers. (I, 215). Phillip Hardy left for work at 2 p.m. (I, 214, 216, 229).

Phillip did not know the number of hours in a day. (I, 216). Rick told Phillip to say that Elizabeth didn't get food for five days. (I, 217). Thereafter, Phillip testified that that was the only day they were locked in the room, but then, testified that there were additional days he was locked in the room. (I, 229-230).

Elizabeth testified that she was in the third grade. (I, 239). Elizabeth's room was Thomas' old room. (I, 240-241). Elizabeth and Phillip shared the bed in her room. (I, 241). The heating vent hole led to the basement where Elizabeth would get food for Rick from the two freezers there. (I, 242-243).

Elizabeth confirmed that Sheila home schooled them. (I, 239, 243). If they didn't finish their homework, they were grounded or got timeouts. (I, 243-244). For timeouts, they had to stand in the corner for the same number of minutes as their age. (I, 245). They could also be locked in their room. (I, 246, 252). They were also locked in when Sheila slept. (I, 247). "Sometimes" if they were in trouble, they wouldn't be fed for a day or longer. (I, 252).

At night, the door was locked. (I, 248). If they had to use the bathroom, they had to wake up Defendants. (I, 248). Sometimes, Defendants would not get up, resulting in Elizabeth wetting her pants. (I, 248).

One day they were locked in their room, and they wanted to get out. (I, 249). Elizabeth had not eaten for a couple of days. (I, 251-252). She was feeling sick. (I, 251). Phillip put a hole in the door and Elizabeth got out and unlocked the door. (I, 249). They ran away. (I, 249, 251). At first, they went into the woods, but then, they talked to the neighbors. (I, 252).

According to Elizabeth, there was food in the kitchen, but it was also locked in Defendants' bedroom. (I, 250). If they touched that food, they would get in trouble, be grounded and sent to their room and locked inside. (I, 250-251). Phillip Hardy also spanked them with a belt. (I, 247). Initially, Elizabeth told the police that that was the only time she was locked in the room. (I, 255). Elizabeth didn't tell the police about not being fed. (I, 256). After the officer continued to ask questions, Elizabeth reported not having food for five days. (I, 256). Elizabeth was nervous about being in the police car, but told the truth, just not all of it. (I, 257). Elizabeth thought that she would be in trouble if she didn't tell the same story she had told the police. (I, 256).

8

Linda Hilborn became Elizabeth and Phillip's foster mother. (I, 258-259). When they arrived, Phillip was in the third grade and Elizabeth was in the second grade. (I, 271). Initially, the children hoarded food. (I, 259-260). Elizabeth, for example, hid pizza in her pillowcase as well as green tea under her bed; Phillip had a brown sugar container in his bed. (I, 259-260). Hilborn had to secure the food in her house. (I, 260). Elizabeth then asked Hiborn to leave something on the counter in case she got hungry during the night and Hilborn did so. (I, 260-261). Hilborn noted that the children were eating a lot. (I, 261).

Phillip urinated on the carpet in his bedroom and wouldn't tell Hilborn when he wet the bed. (I, 262, 266-267). At first, Phillip wouldn't say anything, but then he stated that it was from a water bottle. (I, 267). When Hilborn began to clean the carpet, she again asked Phillip, who then claimed that he could not get into the bathroom; Hilborn explained to him that there were two bathrooms. (I, 262, 266-267, 270-271). Hilborn also reported that Elizabeth defecated in her closet, and, initially, attributed it to the dog. (I, 262-263, 267-268).

Phillip, who was destructive and would throw things when angered, asked for his bedroom door left open. (I, 263-264). Jewelry and money were also missing from Hilborn's home, but the money was later found. (I, 268).

Hilborn took Phillip to the doctor, who prescribed medication. (I, 268-269). To Hilborn's knowledge, Phillip was not on any medications before he came to live with them. (I, 269). The medication was helping. (I, 269). The state paid for the children's medical care. (I, 273).

Both children were in counseling. (I, 269, 272). The state paid for counseling. (I, 273).

Both children wanted to go home. (I, 269-270).

Doctor Daniel Tackabury, an expert in family medicine, saw Phillip and Elizabeth for a well child visit on December 2, 2008. (II, 61-74, 96). The children's medical records were admitted and are attached as Appendix B. (II, 74-75). Phillip was 50½" tall. Appendix B. Phillip's liver enzymes, including his ALT (alanine aminotransferase) and AST (aspartate aminotransferase) were elevated. (II, 75, 81). A normal ALT was 7 to 56 and Phillip's was 100; a normal AST was 8 to 40 and Phillip's was 48. (II, 82, 89). There were many causes for elevated liver enzymes, including drinking alcohol, gall bladder disease, viral hepatitis, metabolic disease or genetic disease. (II, 82). Phillip also had mild anemia. (II, 75, 81). Phillip was below the three percentile for height on his growth chart, even though his parents were not unusually short. (II, 76, 84).

Elizabeth also had elevated liver enzymes and mild anemia. (II, 76-77). Elizabeth's ALT was 67 and her AST was 43. (II, 89). She was also below the three percentile for height on her growth chart at 47½". (II, 77, 84, 93); Appendix B.

Both children were in the lower weight range for their ages. (II, 84-85). Elizabeth weighed 58 pounds; Phillip, 68 pounds. (II, 93); Appendix B. In addition, both had low total protein in their metabolic panel. (II, 90). Malnutrition was certainly high on the list of potential causes for those test results. (II, 90-91).

Dr. Tackabury confirmed that if a child hadn't eaten for five days, she could

throw up water, and be lethargic, weak and irritable. (II, 94, 96).

When Dr. Tackabury saw the children two weeks later, on December 18, 2008, Phillip had gained four pounds and Elizabeth gained one. (II, 91, 95-96).

Dr. Tackabury testified that consistently denying a child food over a period of time could affect his or her growth. (II, 91-92). It could also weaken the child's immune system, decrease intellectual development and cause mental deficiencies. (II, 92). Those conditions might be correctable with proper food and medical attention depending on how long the damage was inflicted. (II, 92-93).

Randall Christensen, an expert in psychology who had 25 years of experience in interviewing children and adults, interviewed Phillip and Elizabeth on December 18, 2008. (II, 98-103, 120, 122). Phillip was in the third percentile for intelligence on his IQ test. (II, 106). Phillip was under socialized. (II, 107-108, 135). In his future, that could result in interpersonal relationship problems, immature behavior, peer relationship problems, and Phillip living life outside the mainstream. (II, 109). Phillip could also experience frustration and anger, learning to act out and hit rather that using words or language to solve problems. (II, 110). He was at risk for depression, anxiety, and being obsessive compulsive. (II, 110).

Both children's psychological development resulted from their family history of bipolar disorder, the termination of their natural mother's parental rights and the care provided by Defendants. (II, 111-112, 124-126). Neither Phillip nor Elizabeth had been diagnosed as being bipolar. (II, 127). According to Christensen, children could have a life-long impact from mistreatment, even at ages as young as two and four. (II, 113-114). Christensen had also evaluated Phillip when he was four. (II, 115, 120, 128). At that time, Phillip was sexually acting out and displaying out of control behavior and anger from a combination of his family's bipolar disorder and mistreatment. (II, 115, 128, 130-131). By 2008, Phillip had "deteriorated." (II, 115-116). He was hoarding food, a symptom of having had food withheld and, in addition, obsessive-compulsive behavior. (II, 116, 140). He was emotionally significantly delayed. (II, 116).

Elizabeth's IQ was 80. (II, 117). She was at the very low end of the low average range – in the 9th percentile. (II, 117). Her functioning was below her innate level of intellectual functioning due to her psychological problems. (II, 117). She was also under socialized. (II, 117, 135). Elizabeth was a "very intense, distressed child." (II, 117). Elizabeth had "significant psychological damage." (II, 118). Like Phillip, she faced "some real lifelong psychological problems." (II, 118). She is going to have difficulty fitting in, have educational problems and impulse control problems given her hoarding and stealing. (II, 118). She was at high risk for substance abuse and negative behavior and at increased risk for illegal behavior as an adult. (II, 118).

Elizabeth had post-traumatic stress disorder. (II, 119). Her environment would likely be the first cause of her behavior given that she was two years old when she entered it and, therefore, any problems she had at that time should have been corrected with proper care. (II, 122, 141). Likewise, Phillip should have improved with "even minimally adequate parenting." (II, 141).

10

Christensen's reports were admitted. (II, 123). Christensen opined that the children's psychological needs were not being met. (II, 132-133, 136). Both children's problems could be caused by being denied food, being locked in a room and not being allowed to socialize outside of their home. (II, 138-141).

Sheila testified that she was 42, had a bachelor's degree and was married to Phillip Hardy for 21 years. (II, 152, 225). They went through training to become foster parents, but they were not required to take a parenting class and were not given a class on how to handle or parent a bipolar child. (II, 152-154, 201, 206). Their current home had been the subject of a home study. (II, 153-154). They had had 20 foster care children over eight years. (II, 154-155, 207). Twelve of those children stayed less than a week or two, but the other eight stayed nine months to a year. (II, 155). Defendants had had other children who were ADHD. (II, 157).

Defendants adopted Thomas, who was 28, Rick, who was 19, and Phillip and Elizabeth. (II, 155). Sheila could not recall any complaints about the nutritional needs of the children not being met or about the physical discipline they used; in particular, Sheila did not recall four or five earlier CPS' investigations. (II, 155, 208-209). Ultimately, Sheila admitted that there was "[p]ossibly" a complaint from Rick that they had withheld food from him, but she did not recall a referral about Rick "being too thin." (II, 208-209). Sheila then recalled an investigation during which Thomas' arm was broken by one of the foster children, who claimed that Thomas was picking on them. (II, 209-210). According to Sheila, a DHS' worker would visit their home every year. (II, 156, 223).

When Phillip arrived, he was four. (II, 158, 204). On a scale of zero to three, with three being the most severe, Phillip was a three. (II, 195-198). Sheila described Phillip as being "extremely hyper, extremely destructive." (II, 160). The first week, he broke one of the windows. (II, 160). He also had tantrums during which he "destroy[ed] things and hit." (II, 160). Phillip defecated in his pants "a lot" and smeared it on the walls. (II, 160). Phillip also lied and stole. (II, 160). Even so, in about six months, Phillip improved to a level two. (II, 198). Phillip was very small. (II, 162). Defendants received no medical or psychological history for him, but were aware that he had a medication regimen for ADHD. (II, 160-161). They also learned that he had two sisters when he had visitation with his biological parents. (II, 159).

Elizabeth, who had just turned three, joined Phillip in Defendants' home three months after he arrived. (II, 159, 161, 204). According to Sheila, Elizabeth "was very small" and wore 18-month-old clothing. (II, 162). Elizabeth could barely talk. (II, 163). Within six months, Elizabeth also had severe tantrums, slammed doors and banged her head. (II, 163-164).

Defendants took the children to the doctor and dentist. (II, 162-163, 181, 242). No doctor ever expressed concerns over the children's height or weight. (II, 181). Phillip also received counseling for a couple of years. (II, 163, 201-202, 226). Although the counseling was free, they stopped because Phillip "had improved so much." (II, 226). Sheila admitted that she "should have been back" for more counseling. (II, 227). Despite the children's purported behaviors, Defendants adopted them in 18 months. (II, 159, 163-164). Defendants received approximately $1,000

each month after they adopted the children as well as receiving $400 a month in Social Security. (II, 242).

According to Sheila, Phillip and Elizabeth improved "every month." (II, 202-203). In fact, Phillip improved so much that they stopped his medication a couple of years after he stopped counseling because they weren't "big believer[s]" in medications. (II, 227-228).

Phillip was in Head Start before kindergarten and was "hyper" and "[d]elayed." (II, 165, 244). Phillip attended young fives and, then, kindergarten. (II, 165-166, 244). Phillip only attended for one-half of the year because he was hitting and kicking other children and remained "[d]elayed." (II, 167). At that point, Defendants, in conjunction with Phillip's teacher, decided to home school him. (II, 167, 244). Sheila never sought out special education services for Phillip. (II, 245-246). Instead, Sheila found a home-schooling program, taking 3 hours a day. (II, 168-169, 171). They had 180 school days. (II, 169). When they could read, they had a certain amount of pages to complete every day. (II, 169).

Sheila had also home schooled Rick from fifth grade. (II, 170). Rick went into the Army and took a test. (II, 170). They gave him GED classes and he passed. (II, 170, 243-244). Thomas, however, did not obtain a GED despite Sheila's home schooling. (II, 170-171, 244). Phillip had made it to the third grade level before he was removed. (II, 199).

Sheila testified that Defendants' house "was nice and neat" before Phillip and Elizabeth came, even though Thomas had punched a hole in the wall. (II, 172). According to Sheila, Phillip and Elizabeth destroyed Elizabeth's room, hitting the walls with their toys. (II, 173, 217). Appendix A. They also put holes in the bathroom wall. (II, 173).

Sheila testified that the urine smell came from two sources – the bathroom ring in the bathroom, which shared a wall with Elizabeth's room, leaked, and Elizabeth failed to let out the animals she wanted to sleep with her. (II, 174, 234-236). Sheila did not think that the urine odor in Elizabeth's room was strong. (II, 236). In any event, the toilet ring had been repaired. (II, 174). The carpet had been replaced with washable tile floors. (II, 175). And, Defendants had put plywood on the walls and painted them. (II, 175). Sheila was waiting for Phillip and Elizabeth to come home so that they could decorate their rooms. (II, 175).

Sheila confirmed that she and Phillip Hardy had rules. (II, 177). The children were not to hit and they had chores every day. (II, 177). Lying and stealing were also prohibited. (II, 177). If the children broke the rules, they would get a timeout, be grounded or have privileges withheld. (II, 177, 231-232). The failure to do homework or paces was not punished by timeouts. (II, 231). However, the length of the timeouts was consistent with the children's ages. (II, 231).

Sheila testified that they never deprived the children of food, but then admitted that snacks were withheld as punishment, but not dinner or meals. (II, 178, 180, 232). Snack food was put up out of the children's reach and "doled out" at snack time because it would have been all gone otherwise. (II, 178-179).

Defendants kept the basement locked because they had freezers down there.

(II, 178).

According to Sheila, Phillip and Elizabeth didn't "know when to stop . . . eating." (II, 179-180). Once, Phillip ate 21 sandwiches for lunch and Elizabeth ate 13. (II, 180). On another occasion, they took Phillip to a buffet and he ate until he threw up. (II, 180). Sheila reported that they tried different things, including allowing the children to eat all they wanted during meals, but not between meals. (II, 179). At one point, Defendants put a lock on their refrigerator. (II, 179).

Sheila specifically denied that Elizabeth had not eaten for five days, stating that Phillip Hardy took her to McDonald's the morning the children ran away. (II, 180-181). The children had "never gone without food, not even for a day." (II, 181, 231). Sheila also denied that she rationed food by the week. (II, 233).

Phillip Hardy worked the second shift, leaving at 2 p.m. and working from 2:30 p.m. until 11 p.m. (II, 182). He would return at 11:30 p.m. (II, 182). Sheila would leave for work at 7 p.m. and start at 8 p.m. (II, 182). She worked at different places and did not have a set schedule. (II, 182). Rick would watch Phillip and Elizabeth if Defendants were working. (II, 182-183). Rick left six days before Phillip and Elizabeth were left home alone. (II, 183-184, 230, 240-241). Defendants and Rick mutually decided that he should leave because Phillip and Elizabeth reported that he had been picking on and hurting them. (II, 211).

Thomas left when he was 21. (II, 211). There was a message left on Elizabeth's bedroom ceiling, which was signed by Thomas; Elizabeth's room had been Thomas' room. (II, 212-217).

Elizabeth's vent was covered because they had a wood stove and were trying to prevent cold air from coming up. (II, 224). Elizabeth's window was boarded up because it was broken. (II, 224-225). Sheila conceded that the children had jumped out the window and she warned them about getting hurt. (II, 225). They also fixed the window. (II, 236). It was the fourth time that Phillip and Elizabeth had broken it. (II, 236).

According to Sheila, Defendants put the alarm on Elizabeth's door after Phillip arrived because he wandered at night and they were afraid for his safety. (II, 184). The alarm merely sounded when the door was opened. (II, 185). They had replaced the alarm five or six times because the kids broke it or it would break. (II, 237-238). Sheila testified that there was no dead bolt lock on Elizabeth's door until after Rick left, but, then, admitted that there was one. (II, 184, 186, 229).

They talked to Phillip and Elizabeth about the fact that they would be left alone for 2 to 2½ hours. (II, 186-187). The children had Defendants' cell phone numbers on their cell phone. (II, 187, 189, 230). Sheila later learned that the children had tried to call for pizza and had cursed at the pizzeria's employees. (II, 188, 230, 241).

Despite that incident, Phillip and Elizabeth were locked in the room for the first time for what was supposed to be 2½ hours. (II, 189, 201, 228-229, 240). Sheila reported receiving 10 calls from the children inquiring about when she was coming home. (II, 189, 230). When Sheila arrived, she saw the door and went looking for the kids after calling Phillip Hardy. (II, 190-191).

13

Thereafter, the neighbor came by, telling Sheila that she had the kids. (II, 189, 191). The neighbor returned them. (II, 191). Sheila was never told that the children were begging for food. (II, 190). Sheila asked them why they left, but she didn't receive an answer. (II, 192).

Only Phillip Hardy spanked the children with his hand. (II, 192-193, 238). Phillip was spanked every two or three weeks. (II, 193, 238-239). Phillip was spanked if he broke the same rule over and over in the same day or if he refused to do timeouts. (II, 193, 239). Phillip Hardy would explain why Phillip was being spanked. (II, 194).

Phillip Hardy also spanked Phillip with a belt, but less than 20 times. (II, 194, 238). Phillip Hardy would tell Phillip why he was being hit with the belt. (II, 195).

When the children were removed, Defendants had five dogs and three cats. (II, 200, 220). Defendants had building materials in Phillip's bedroom to repair the bedrooms with Phillip's room being first and Elizabeth's being second. (II, 200, 237, 246).

Sheila attributed her lack of emotion upon learning that the children were going to be removed to her personality and an EMT class she was taking wherein she had been instructed not to show any emotion. (II, 205-206). By the time Phillip Hardy arrived home, however, Sheila testified that she was curled up in a fetal position in a chair. (II, 206). Sheila denied telling Trooper Coulter that she regularly locked the children in their room. (II, 237).

Sheila wanted Rick to testify, but the Army would not give him leave. (II, 245). Trooper Coulter had earlier testified that she had attempted to contact Ricky, and he later called the post. (II, 47). Ricky was going to call back because his connection was bad, but he never did. (II, 47). Coulter never got a statement from him or learned where he was. (II, 48).

Phillip Hardy testified that he believed that he put the dead bolt lock on Elizabeth's door after the children were left home and ordered pizza. (II, 248, 258-259). Knowing that Rick was leaving, they were in the process of getting child care that was to begin on Friday or Saturday. (II, 249). The day the children kicked the hole in the door, he took them to McDonald's for breakfast. (II, 250). They had bologna sandwiches and apples along with a glass of milk for lunch. (II, 250). He let them use the restroom. (II, 250, 261).

Knowing that Sheila would be home in a couple of hours, Phillip Hardy used the dead bolt lock on Elizabeth's door for the first and only time. (II, 249-251, 257). According to Phillip Hardy, he left the children with a cell phone. (II, 250). He acknowledged that locking the children in Elizabeth's room "was a lapse of judgment" and "a stupid idea." (II, 250, 257, 264). Phillip Hardy removed the dead bolt immediately because he didn't want the children to accidentally be locked in the room. (II, 251-252, 259).

Phillip Hardy testified that DHS approved their use of an alarm because the children wandered; the alarm had been on for years. (II, 251, 259-260).

The cover over Elizabeth's heating vent was there to keep the cold from getting in and a new heating system was being installed. (II, 263-264).

14

Like Sheila Hardy, Phillip Hardy testified that there was a toilet leak. (II, 265). Although the toilet was fixed, he hadn't gotten around to fixing Elizabeth's floor, and he hadn't heard any complaints. (II, 265-266).

Phillip Hardy admitted that he spanked Phillip and Elizabeth with his hand; however, he used a belt with Phillip approximately three times for "extreme infractions." (II, 252-254). Phillip Hardy testified that a spanking was normally "one to two swats on the back side, and in an extreme condition it would be a maximum of the number of years of their age." (II, 254-255).

Phillip Hardy never deprived the children of food as punishment. (II, 253, 256). The children "ate three meals every day." (II, 257). Phillip Hardy admitted that he and Sheila kept snacks and treats in a separate place and they were dispensed at their discretion. (II, 253-254).

Phillip Hardy agreed that Defendants decided to stop counseling and medication because Phillip "had improved considerably in his behaviors." (II, 266-267). They were not "strong believer[s] in the ADHD medications" because "they can lead to things later on in life, [including] addictive behaviors." (II, 266-267). Phillip Hardy disagreed with Christensen's opinion. (II, 267-268).

Like Sheila, Phillip Hardy did not recall any other CPS' complaints. (II, 268, 270). In particular, Phillip Hardy did not recall any complaints that Rick looked too thin and had had food withheld from him. (II, 269). Phillip Hardy recalled the complaint about Thomas' broken arm. (II, 269).

Answer, at 11-26 (quoting Pl.-Appellee's Br. on Appeal, in *People v. Hardy*, No. 296509 (Mich. Ct. App.), at 3-23; *see also*, Def.-Appellant's Br. on Appeal, at 1-26.

Following petitioner's conviction, the trial court held an evidentiary hearing on petitioner's motion for a new trial. Petitioner's trial attorney, Steven Freeman, his employer, Susan Osborne, and his older adopted son, Rick Hardy, testified at the evidentiary hearing. That testimony was likewise accurately summarized by the prosecutor in his brief to the Michigan Court of Appeals, as quoted in respondent's Answer:

At the hearing, trial attorney Steven Freeman testified that he had been in private practice for 19 years, exclusively practicing criminal defense for 17 years. (GI, 24-25, 63-64). In the last six or seven years, he had been practicing at Kronzek & Cronkright. (GI, 25-26). The firm advertised itself as "Michigan's Top Criminal Defense Firm." (GI, 28). It further advertised its use of private investigators. (GI, 28-29). Freeman's biography noted his history as a police officer and investigator for ten years. (GI, 25, 28). Freeman had handled between 1,500 and 2,000 criminal cases with one-half of them being felonies. (GI, 64). He had handled 8 to 12 child abuse

cases, but could not recall if they had gone to trial. (GI, 64-65). Freeman tried 6 to 8 cases a year. (GI, 65, 93-94).

Freeman's firm charged a flat-rate retainer for criminal representation. (GI, 30). Freeman did not recall how much time he spent on these cases. (GI, 30-31). Freeman agreed that Brandy Thompson from his firm may have handled the concurrent neglect proceedings involving Defendants. (GI, 33). While Freeman did not recall talking to Thompson, it was likely that he did because it would not be unusual for his office to tell Defendants that there would be a coordinated effort regarding the criminal and neglect matters. (GI, 31-32, 59-60).

Freeman recalled the joint representation issue being raised during an in-chambers' pretrial. (GI, 33, 73). Freeman had no written waiver regarding joint representation. (GI, 34). Freeman did not perceive a conflict in Defendants' defenses and did not believe that he discussed the issue of separate trials with them. (GI, 34, 75-76).

Freeman met with Defendants before trial, recalling more than one meeting, but not the exact number of meetings they had had. (GI, 34-35, 65). Freeman received discovery, which he discussed with Defendants. (GI, 72). Freeman did not recall filing any pretrial motions, even though he told Defendants that he would file a motion to exclude the photographs admitted during preliminary examination. (GI, 55). After speaking to one of the troopers and seeing that the other trooper and Price had the same version of how the photographs were taken (i.e., with Sheila's consent, even though she denied giving it), Freeman determined that filing such a motion would be frivolous. (GI, 35, 80-82).

Freeman also told Defendants a week before trial that he would review their witness list and get back to them about the witnesses they wanted called. (GI, 53-54, 87). Defendants' provided a synopsis of each witness' testimony. (GI, 85). Freeman did not contact any of those witnesses. (GI, 54). Freeman remembered those witnesses as being ones who would testify that they had seen the children eat nutritious food at mealtime. (GI, 68). Freeman did not call those witnesses because they were not there every day and not central to his strategy. (GI, 69, 85).

Defendants also wanted their neighbor called. (GI, 69). However, Freeman recalled Phillip and Price admitting that Phillip and Elizabeth had gone to the neighbor's to make popcorn. (GI, 84-85). In Freeman's opinion, the most important part of the case was the children being locked in Elizabeth's room. (GI, 70, 82-83, 87). Defendants offered no one who would rebut that there was a lock outside the door, that there was a repugnant urine smell, that the windows and heating vent were boarded over, that Phillip Hardy used a belt to spank the children, or that Sheila had the children engage in paces and timeouts. (GI, 70-71, 87-88). Freeman was convinced that the jury convicted Defendants because the children – who were special needs – were locked in a room with no way to get out except to kick a hole in it. (GI, 88). And, none of Defendants' proffered witnesses or records took away from Phillip's "genuine believability[.]" (GI, 71, 87).

After observing and hearing Phillip's testimony at preliminary examination, Freeman told Defendants that he was convinced that their likelihood of being

convicted was high. (GI, 71). Freeman encouraged Defendants to accept a plea with a one-year cap. (GI, 73, 77). Defendants insisted on proceeding to trial. (GI, 77). Freeman was prepared for trial and prepared for each witness' testimony. (GI, 77, 79, 85, 88-89). Freeman also reviewed the preliminary examination transcript before trial. (GI, 67).

Freeman did not speak to a Richard or Thomas Hardy, the older adopted children. (GI, 35, 38-39, 44). Freeman did not remember interviewing anyone else. (GI, 36-37). Freeman was aware that Rick had turned 18, enlisted and was deployed at the time of trial. (GI, 44). Defendants wanted Freeman to call Rick. (GI, 45). Although Rick was at basic training, by the time of trial, he was overseas and unavailable. (GI, 46).

Freeman agreed that trial began on November 3, 2009. (GI, 101). On September 29, 2009, Sheila Hardy sent Freeman an e-mail, indicating that Rick was in Kansas. (GI, 101-102). Defendants e-mailed Freeman on October 9, 2009, about contacting Rick and obtaining his presence to testify. (GI, 47). Defendants wanted Rick to testify that they had different shifts and he provided childcare for them. (GI, 68). Freeman could not recall what efforts he made to secure Rick's testimony after receiving the e-mail. (GI, 48). Freeman would have asked his administrative assistant to make the initial contact, and, if successful, to coordinate a time and day for a phone conference. (GI, 48).

Freeman then confirmed that he sent an e-mail on October 28, 2009 to Defendants, in response to their October 21, 2009 inquiry, informing them that he had had no contact with Rick. (GI, 49, 53). Freeman further stated that Rick could not testify because the court did not have the technology to accommodate his testimony. (GI, 53, 83). Freeman checked with someone on his staff to see whether Rick could appear via computer, his preferred method for having Rick testify. (GI, 61, 83-84). Freeman recognized that Rick could have testified by telephone, but did not have the prosecutor's stipulation to do so. (GI, 61-62, 83).

Freeman described Rick as "an asset and a liability." (GI, 69, 84). Although Freeman believed that Rick would confirm that he watched Phillip and Elizabeth, "there was a danger that he would testify about other things that he saw and other things that he heard upon cross-examination[.]" (GI, 70). Freeman "chose not to open that door." (GI, 70).

Defendants provided him with medical records. (GI, 55-56). Freeman did not call any witnesses to testify about the earlier condition of the children. (GI, 57). Freeman did not request an independent medical or psychological evaluation of the children because he believed that the central issue was the lock. (GI, 55, 57, 82-83). Freeman did not consult with any expert witness about the opinions expressed in the People's medical and psychological reports. (GI, 58).

Although Freeman did not challenge the competency of the children, he recalled the district and circuit court making the proper inquiries and, therefore, it would have been futile to do so. (GI, 62, 78, 97-99, 106).

Freeman prepared Defendants to testify, discussing numerous aspects of being a witness with them, during trial. (GI, 95-97).

17

Freeman had had two grievances filed against him – one in October, 1994, and another in June, 2000. (GI, 91-93, 102). The first grievance did not involve a criminal case, but probating a will and not filing a timely inventory. (GI, 92, 102-103, 105). Freeman had been grieved numerous other times – once or twice each year. (GI, 104-105). But "they all [came] back unfounded, unfounded, unfounded." (GI, 104). It was one of the things that went along with practicing criminal law and having a client convicted. (GI, 91-92, 104).

Susan Osborne testified that she first met Defendants in 1992, 1993, or 1994 when she sold their store in Kingston. (GI, 109, 119). Osborne was at Defendants' home on a single occasion at that time. (GI, 112, 118). Phillip Hardy came to work for Osborne's real estate office in 2000 or 2001. (GI, 109, 119). When Phillip Hardy worked, he would bring the children in with him a couple of times a week; however, when Rick was in the Tech Center, they came in on the days he was there. (GI, 110-111). The children did not appear unkempt and they showed up in clean clothing. (GI, 111). Elizabeth was "pretty well behaved," but Phillip was hyper. (GI, 121). From what Osborne observed, she did not feel that the children were malnourished. (GI, 114). Phillip Hardy would bring lunchmeat, bread and soup for the children. (GI, 116). The children could help themselves to candy if they wanted it. (GI, 116). The children were not fearful of Phillip Hardy and talked about all the things that they did with him. (GI, 116). Osborne had no concerns about the children and testified that they seemed happy, but she was not a doctor or psychologist. (GI, 117, 119, 121).

Defendants asked Osborne to testify for them. (GI, 117). To Osborne's knowledge, Freeman never contacted her. (GI, 117).

The trial court permitted 21-year-old Richard Hardy, who had been in the Army since February 17, 2009, to testify telephonically. (GII, 9, 53). Defendants adopted Rick when he was 11. (GII, 13). Rick attended public school until he was in the 5th grade. (GII, 14). Because he didn't do well, Sheila home schooled him. (GII, 14-15). Rick did not like being home schooled at the time, but opined that he performed better on his ASVAB (Armed Services Vocational Aptitude Battery) because of it. (GII, 15-16).

Rick did not remember exactly when he left, but thought that it was one to two weeks before Phillip and Elizabeth ran away. (GII, 19, 51, 54-55). Rick left when he was 18, spending time with his grandparents before leaving for the Army. (GII, 18-19, 52, 54). Rick left because Defendants asked him to; however, he already wanted to leave because he wasn't obeying Defendants "and didn't really care what they said." (GII, 54).

Elizabeth and Phillip came to live with Defendants when Rick was 15 or 16. (GII, 19). After being informed that Phillip and Elizabeth had been in Defendants' house since 2003 or 2004, Rick admitted that he "didn't pay attention to the years." (GII, 35). Phillip, who had ADHD, and Elizabeth were "kind of skinny and small for their age[s]." (GII, 22, 25).

Rick testified that the family ate 3 meals a day. (GII, 19-20). Food was never withheld as punishment. (GII, 20). Neither the refrigerator in the kitchen nor the

18

cupboards were locked. (GII, 21). The basement, where the deep freezer was, was locked. (GII, 21, 41).

Rick agreed that he had timeouts, was grounded, and had to write sentences and exercise, but it was only "a couple of times." (GII, 22, 44). Rick was spanked, but "[i]t was an extremely rare occurrence" – once or twice. (GII, 22, 45). Phillip and Elizabeth also had timeouts, were grounded and "had their sentences once[.]" (GII, 23).

Rick denied that Phillip Hardy ever used a belt to discipline Phillip and Elizabeth. (GII, 34, 45). After being made aware that Phillip Hardy admitted to doing so, Rick testified that it never occurred in his presence. (GII, 34-35).

Rick was allowed to give Phillip and Elizabeth timeouts, but he was not allowed to physically discipline them. (GII, 45). Rick began to watch Phillip and Elizabeth for short periods of time when he was 17. (GII, 46-47). The assistant prosecutor noted that Rick had charges pending against him alleging he had sexually abused Elizabeth. (GII, 46, 48-49).

Rick lived in Elizabeth's room for a couple of months. (GII, 23). Rick denied that there was a lock on the door. (GII, 23, 41-42). Rick did not recall drill holes where a lock might have been. (GII, 41). But see Appendix A. Instead, there was an alarm on the door for safety because Elizabeth liked to get into things. (GII, 23-24, 41). The window was boarded up because Phillip broke it once or twice and Elizabeth broke it at least once. (GII, 25, 40-41). Phillip and Elizabeth also damaged the walls because "they were both destructive when they came." (GII, 25). Defendants were remodeling the basement and making small repairs because Phillip was destructive when he threw fits. (GII, 31).

Rick did not know about any soft spot on the floor. (GII, 25-26). Rick denied that the toilet in the bathroom next to Elizabeth's room was broken. (GII, 39-40). Rick was aware of the urine smell, testifying it came from "[t]hem [Phillip and Elizabeth] and/or the dogs." (GII, 40).

Rick denied that the heating vents were boarded up, but admitted that the cold air return was because it was broken. (GII, 41). Rick had Elizabeth crawl through the vent to get "[g]ames and such[,]" but "[n]ot necessarily food." (GII, 41).

Elizabeth and Phillip were never left home alone when he lived with Defendants. (GII, 28, 51). Phillip and Elizabeth were never locked in their room while he lived at home. (GII, 42).

Rick's older brother Thomas was in Texas and available to testify; however, he was not living with Defendants during most of the time that Phillip and Elizabeth were there. (GII, 36).

When asked about Thomas' writing in Elizabeth's bedroom, which "kind of called" Defendants "monsters," Rick testified that he didn't "remember the specifics." (GII, 37-38).

Rick testified that Trooper Coulter had called him and recorded a conversation during which she had asked him the same questions. (GII, 24, 43). Rick claimed to be "kind of a little awkward toward her[,]" but he had given the same answers. (GII, 24). Rick later admitted that he had answered only a couple of

Coulter's questions and did not answer others because he "had no clue as to what she was talking about." (GII, 43).

Rick was never contacted by Freeman or anyone from his office and Rick did not call Freeman. (GII, 28, 30, 44, 55). Rick was available to testify at trial by telephone, but was unsuccessful in obtaining permission to testify in person. (GII, 29, 32-33). Phillip Hardy had Rick's telephone number. (GII, 30-31, 55).

Rick admitted there may have been DHS' investigations while he lived with Defendants. (GII, 42). Rick did not recall DHS investigating a claim he was underfed. (GII, 42). Rick remembered the complaint about Defendants telling him to stay out of the house as they showered because he "was destructive and didn't really care what they said at that period of time." (GII, 42-43).

Sheila Hardy, who had a bachelor's degree in accounting, but was not a certified public accountant, testified that she performed the on-line search for legal representation. (GII, 86, 95). Because Defendants were seeking an aggressive defense team, they settled on Kronzek & Cronkright, a Lansing firm. (GII, 58-59, 82, 86-87, 91-92, 109). Freeman met them at their bond hearing and repeatedly stated that he had never lost a case in Tuscola County. (GII, 59-60).

Phillip Hardy paid Kronzek & Cronkright $15,000 and, then, another $5,000 for trial. (GII, 61). For the neglect matter, Kronzek & Cronkright received $13,500. (GII, 61). Defendants met with both attorneys, who were supposed to share information and coordinate their criminal and neglect cases. (GII, 62, 74, 107). Sheila recalled meeting with Freeman three or four times, but Phillip Hardy recalled four or five meetings, including the joint meeting. (GII, 63, 77, 81-82, 88, 109). In the three months before trial, however, Defendants never met with Freeman, but Phillip Hardy communicated with him by e-mail and telephone. (GII, 71, 74, 81, 109). Freeman constantly reassured Defendants he had it all under control and that they should trust him because he was the expert. (GII, 77, 111).

Freeman stated that they would hire expert witnesses, if Defendants paid for them, and promised to use investigators. (GII, 60, 87, 101-102). Although Phillip Hardy was willing to pay for an expert witness to independently test both children, Sheila Hardy could not remember if such evaluations were ever discussed. (GII, 66, 70, 75, 88). Phillip Hardy also wanted his independent psychological examination, which had been prepared for the neglect proceeding and which contradicted Christensen's conclusions about him, to be admitted. (GII, 75-76). And, even though Phillip Hardy gave Freeman information about Phillip's earlier therapist, Freeman did not call that therapist. (GII, 76, 87).

Defendants also gave Freeman medical records that "indicated that the children were well fed and nourished." (GII, 64-66, 80, 108). Sheila was not sure if she disagreed with Freeman's assessment that those records would not have been helpful. (GII, 108). In addition, Defendants printed off growth charts from the Centers for Disease Control that "indicated that the children were actually in the 71st [for Elizabeth] and 76th percentile [for Phillip] of weight to height according to their age[s.]" (GII, 65).

Sheila thought that Freeman would get an independent medical examination

of the children to follow-up on the liver enzyme levels. (GII, 88). And, while Sheila had done no research on the subject, Phillip Hardy had. (GII, 90).

Freeman never advised Defendants about jointly representing them. (GII, 62-63, 78, 87). Freeman never advised them of their ability to request separate trials or juries; however, neither Defendant intended to blame the other. (GII, 63, 78-79, 87, 108).

Defendants denied that Freeman told them to accept the plea offer; instead, he advised them not to accept it. (GII, 78, 110). According to Sheila, Freeman said "I don't think you guys want to go to jail for a year." (GII, 96-97). Sheila testified that Freeman did not go over the sentencing guidelines with them or tell them that they could get a prison sentence. (GII, 97, 99-100). Defendants, however, did know the maximum sentence was four years. (GII, 97-98).

Phillip Hardy confirmed that Freeman told them "that the lock might present a problem"; however, according to Phillip Hardy, Freeman stated it was not "insurmountable." (GII, 83). And, while Sheila recalled Freeman discussing the lock as being a problem, she remembered that it occurred during trial, not during the plea offer. (GII, 111).

Defendants told Freeman about witnesses they wanted called, including Rick, Thomas, Osborne, Phillip Hardy's friends, who saw the children on occasion, and Phillip Hardy's parents, who were helping with the repairs. (GII, 63-64, 106-107). Defendants thought that Freeman would have Rick testify by telephone. (GII, 66-67). A week before trial, Freeman told Defendants that he was going over the witness list and would decide in what order he would call the witnesses. (GII, 67, 82-83). Freeman never told Defendants that his strategy was not to call witnesses; instead, Defendants expected Freeman to call their proffered witnesses. (GII, 82-83, 104-105, 111-112). Phillip Hardy was under the impression that Freeman had subpoenaed his parents, Osborne, Cal and Marsha Jewett and Rick. (GII, 67, 70). Phillip Hardy's parents had been present throughout trial. (GII, 68). And, Osborne was minutes away. (GII, 69).

Phillip Hardy was consistently told that he was not going to be testifying, including the night before trial. (GII, 76-77). Phillip Hardy learned that he would be testifying about 30 seconds before he was called. (GII, 77). However, Freeman "hinted" that Sheila would be testifying on the initial July trial date. (GII, 89). The night before she testified, he prepared her. (GII, 89).

After Defendants were convicted, they fired Freeman, hiring a new attorney for sentencing. (GII, 100). And, although Defendants were satisfied with Thompson's representation, they ran out of money and had to ask for court-appointed counsel on their neglect case. (GII, 104).

Answer, at 29-36 (quoting Pl.-Appellee's Br., at 23-33); *see also*, Def.-Appellant's Br., at 27-38.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

22

precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38,

23

44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Ineffective Assistance of Counsel*

Petitioner first contends that his trial counsel was ineffective for failing to investigate and call witnesses, and for failing to seek severance of his trial from that of his wife. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

24

Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *Id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An

25

ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.   *Analysis*

a.  *Failure to Call Witnesses*

Petitioner first contends that counsel was ineffective for failing to interview and call witnesses, specifically: Richard Hardy, his older adopted son; and his employer, Susan Osborne. The Michigan Court of Appeals, recognizing that the trial court's conclusion that counsel's performance was deficient was "supportable," nevertheless rejected this claim because "it cannot be shown that the Hardys were prejudiced by this failure." *Hard*, 2011 WL 4810772, at *2. The court reasoned:

26

As recognized by the trial court "overwhelming evidence" was submitted to demonstrate that the minor children were detrimentally impacted by the Hardys' parenting. Photographs were submitted verifying the despicable living conditions for the children and officers involved in the investigation testified regarding the stench of urine in the children's living area. The Hardys did not deny either the existence of locks on the bedroom door or that the minor children had been left without supervision and locked in the room while both parents were at work. A psychologist that had previously evaluated one of the children testified and opined that the emotional and psychological condition of that child had deteriorated under the Hardys' care. The current foster mother for the children described hoarding of food by the children and their urinating and defecating in their bedrooms, which was consistent with behaviors exhibited by victims of the type of abuse alleged to have occurred. Further, although the Hardys contend that certain exculpatory evidence may exist to contradict the evidence submitted by the prosecution, they provide no substantive proof regarding the existence of the alleged evidence or verifying the content of the purported testimony to be offered.

Specifically, the Hardys contend that counsel was ineffective for failing to interview or investigate and call as a witness their elder son, who was not residing in the home at the time of the event leading to the removal of the children from the home by DHS. The Hardys contend that the elder son's testimony would have contradicted allegations pertaining to a history of withholding of food and the locking of the children in the bedroom. . . .

While we do not condone a lack of effort by trial counsel to investigate and procure witnesses on behalf of the Hardys, it is highly unlikely that the evidence or testimony omitted would have had a substantial or determinative impact on the outcome of trial given the strength of the case presented by the prosecution. As the Hardys failed to demonstrate the requisite component of prejudice in their assertion of ineffective assistance of counsel, the trial court erroneously granted a new trial.

*Hardy*, 2011 WL 4810772, at *2-*3.  Because its was not "unreasonable for the [Michigan Court of Appeals] to conclude [petitioner's] evidence of prejudice fell short of [the *Strickland*] standard," *Harrington*, 131 S. Ct. at 792, petitioner is not entitled to habeas relief.

A number of factors support, and thus provide a basis for the reasonableness of, the court of appeals's conclusion that petitioner was not prejudiced by counsel's failure to investigate Richard as a potential witness and call him at trial.  First, there is a substantial likelihood that Richard would not have been available to testify at trial.  It was undisputed at the evidentiary hearing that Richard was deployed in the Army at the time of trial, and was unable to secure leave to testify at trial.  *See*

27

Evid. Hr'g Tr., Vol. II, at 29, 32-33.  Richard testified that he could have testified telephonically, but it is doubtful that this would have been a permissible form for his testimony.  Under Michigan law, such testimony would have been permissible only if, *inter alia*, the prosecution agreed to this procedure.  *See People v. Fasel*, No. 300385, 2011 WL 6785752, at *5 (Mich. Ct. App. Dec. 27, 2011) (discussing MICH. CT. R. 6.006(C) and *People v. Buie*, 285 Mich. App. 401, 417, 775 N.W.2d 817, 826-27 (2009).  Petitioner has cited, and I have found, no case suggesting that a criminal defendant possesses a constitutional right to have otherwise unavailable witnesses testify telephonically.[1]

Second, Richard's testimony would not have been particularly compelling in light of the evidence presented at trial.  Although Richard could have provided testimony about the general living conditions in the home and petitioner's treatment of the victims at the time he lived there, there is no dispute that Richard was no longer living in the home at the time of the events leading to the charges.  Further, Richard's testimony regarding the living conditions in the home was contradicted not only by the victims, but also by the testimony of other observers and, importantly, photographs taken of the home. For example, Richard testified that the vent in Elizabeth's room was not boarded over, *see* Evid. Hr'g Tr., Vol. II, at 41, yet significant testimony from both prosecution witnesses and petitioner and his wife indicated that the vent was covered, *see* Trial Tr., Vol. I, at 157, 179; Vol. II, at 11-12, 46, 224.  Richard testified that there was no lock on Elizabeth's door, *see* Evid. Hr'g Tr., Vol. II, at 23, 41-42, but petitioner himself admitted that there was a lock on the

---

[1]Although it does not appear that any federal court has addressed this issue, state courts have found that a criminal defendant has no constitutional right, under either the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment, to present telephonic testimony. *See State v. McCabe*, 251 P.3d 264, 267-68 (Wash. Ct. App. 2011); *Davis v. State*, No. A-8308, 2004 WL 1737546, at *3 (Alaska Ct. App. July 4, 2004).

door, *see* Trial Tr., Vol. II, at 248-59.  Similarly, Richard testified that petitioner never struck Phillip

with a belt, *see* Evid. Hr'g Tr., Vol. II, at 34, 45, but petitioner admitted to doing so at trial, *see* Trial

Tr., Vol. II, at 252-54.  Further, Richard's testimony at trial would have subjected him to cross-

examination, which would have had the potential to reveal damaging testimony relating to the

message left on Elizabeth's ceiling by Thomas, and prior social services complaints involving

Richard, including one alleging denial of food, *see* Trial Tr., Vol. I, at 164, 179; Vol. II, at 208-09.

In addition, expert medical and psychological testimony supported the testimony of the victims.  In

these circumstances, the Michigan Court of Appeals could reasonably conclude that there was not

a reasonably probability of a different result had Richard testified at trial.[2]  Accordingly, the Court

should conclude that petitioner is not entitled to habeas relief on this claim.[3]

### b.  Failure to Seek Severance

Petitioner next contends that counsel was ineffective for failing to seek severance of his trial

---

[2]Most of the court of appeals's focus was on the testimony of Richard.  With respect to the testimony of petitioner's neighbor and employer, their testimony would have offered little to the case. They could have testified only to petitioner's treatment of the children while in their presence.  They could not have offered any testimony relating to the conditions in the home, the use of corporal punishment, or the denial of food as a form of punishment within the home.  Thus, for similar reasons, there is not a reasonable probability of a different result had these witnesses been presented at trial.

[3]I note that the trial court's grant of relief on this claim does not call into question the reasonableness of the court of appeals's contrary conclusion.  This is so because it is evident that the trial court applied the wrong standard of prejudice.  As noted above, under the *Strickland* test, a court asks "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  This is the standard that the court of appeals applied to petitioner's claim.  *See Hardy*, 2011 WL 4810772, at *2.  The trial court, on the other hand, based its decision solely on the fact that, in its view, counsel had performed deficiently.  In making its ruling, the trial court repeatedly made statements that significantly lowered the *Strickland* burden, or even would compel a conclusion of no prejudice under *Strickland*. *See, e.g.*, Evid. Hr'g Tr., Vol. II, at 133 ("If I could set here and say, no, I'm positively certain that it would not [change the outcome], I wouldn't grant the motion."); *id.* ("Now, please make no mistake.  For instance, analytically as a judge, I listened to Mrs. Osborne's testimony.  Would that testimony have changed the end result of this trial in this case?  I don't think so.  I really don't.").

from that of his wife.  The Michigan Court of Appeals rejected this claim, concluding that counsel was not ineffective because there was "no basis or requirement for severance" of the trials.  *Hardy*, 2011 WL 4810772, at *4.  This determination was reasonable.

The Supreme Court has recognized no general right to a separate criminal trial.  In *Zafiro v. United States*, 506 U.S. 534 (1993), the Court considered "whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" *Zafiro*, 506 U.S. at 535.  *Zafiro*, however, was based solely on Rule 14, and did not establish any rule of constitutional law.  It is thus inapplicable to petitioner's state court conviction.  *Cf. Williams v. Singletary*, 114 F.3d 177, 181 (11th Cir. 1997) (noting that *Zafiro* involved an interpretation of the Federal Rules of Criminal Procedure and thus "it is not at all clear that *Zafiro* establishes a rule of constitutional law to be applied to state court judgments in § 2254 proceedings," but finding it unnecessary to resolve the question); *Henry v. Scully*, 918 F. Supp. 693, 714 n.7 (S.D.N.Y. 1995) ("Petitioner's counsel argues that Henry's trial counsel erred in failing to request a severance.  This argument, which depends upon Henry's having had a constitutional right to a severance, is without merit.  Henry has shown no federal constitutional right to a severance.").

Because there is no constitutional right to severance *per se*, habeas relief will be warranted for a trial court's failure to sever a petitioner's trial from that of his codefendants only where the denial itself deprives the petitioner of a fundamentally fair trial.  In other words, "a state trial court's refusal to grant severance mandates habeas corpus relief (1) when the joint trial 'resulted in the deprivation of a specific constitutional guarantee such as the right to call witnesses . . . or the right to confrontation,' or (2) when the joint trial abridged the defendant's 'fundamental right to a fair trial as secured by the Fourteenth Amendment.'" *Turpin v. Kassulke*, 26 F.3d 1392, 1404 (6th Cir. 1992)

30

(Feikens, D.J., concurring in part and dissenting in part) (quoting *Jenkins v. Bordenkircher*, 611 F.2d 162, 168 (6th Cir. 1979)); *accord Hutchinson v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002). Where the denial of a specific constitutional right is not involved, a failure to sever results in a denial of a fair trial only if there "is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Under this prong of the test, severance is generally mandated only in three situations: (1) where there is compelling evidence admitted against a codefendant which would not otherwise be admissible against the defendant; (2) where the sheer number of defendants and charges makes it impossible for the jury to separate the issues involved; and (3) where the defendant's involvement in the crime is significantly different in scope or magnitude from that of his codefendants. *See United States v. Blankenship*, 382 F.3d 1110, 1123-25 (11th Cir. 2004). However, joint trials are favored, and the potential for prejudice alone is insufficient to mandate severance. *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

Here, petitioner has failed to show that a joint trial with his wife violated any constitutional right or was so prejudicial as to deprive him of a fair trial. As the court of appeals correctly observed, "the Hardys' defenses were fully consistent and in concert with one another and were neither mutually exclusive nor irreconcilable." *Hardy*, 2011 WL 4810772, at *4. Thus, there would have been no due process basis upon which counsel could seek severance. Further, the Michigan Court of Appeals determined that petitioner was not entitled to severance as a matter of state law, and this state law determination is binding on this Court in analyzing petitioner's ineffective assistance claim. *See Narlock v. Hofbauer*, 118 Fed. Appx. 34, 34 (6th Cir. 2004) (per curiam); *Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). Because it is well established that counsel cannot be deemed ineffective for failing to raise a meritless objection, *see Bradley v. Birkett*,

31

192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995);

*Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993), petitioner cannot show that counsel was

ineffective for failing to seek severance.

E.    *Joint Representation*

Petitioner next contends that he was denied his right to counsel based on counsel's joint

representation of both him and his wife.  The Court should conclude that petitioner is not entitled

to habeas relief on this claim.

1.    *Clearly Established Law*

The Sixth Circuit has succinctly summarized the clearly established law governing joint

representation claims:

> The Supreme Court set forth the standard for reviewing claims of ineffective
> assistance of counsel resulting from a conflict of interest in *Cuyler v. Sullivan*, 446
> U.S. 335 (1980), and summarized it again in *Strickland v. Washington*, 466 U.S. 668,
> 692 (1984). "[P]rejudice is presumed when counsel is burdened by an actual conflict
> of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the
> most basic of counsel's duties. Moreover, it is difficult to measure the precise effect
> on the defense of representation corrupted by conflicting interests." *Strickland*, 466
> U.S. 668, 692 (1984) (citing *Sullivan*, 446 U.S. at 345-50). However, "[p]rejudice
> is presumed only if the defendant demonstrates that counsel 'actively represented
> conflicting interests' and that 'an actual conflict of interest adversely affected his
> lawyer's performance.'" *Id*. (quoting *Sullivan*, 446 U.S. at 350, 348).

*Boykin v. Webb*, 541 F.3d 638, 642-43 (6th Cir. 2008) (parallel citations omitted).  In the absence

of an objection to joint representation, the trial court has no duty to inquire into a potential conflict.

"Absent special circumstances, ... trial courts may assume either that multiple representation entails

no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist."

*Sullivan*, 446 U.S. at 346-47.  To show an actual conflict of interest, petitioner must "point to

specific instances in the record to suggest an actual conflict or impairment of his interests and

32

demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other," or failing to "explor[e] possible plea negotiations and the possibility of an agreement to testify for the prosecution." *McElrath v. Simpson*, 595 F.3d 624, 631-32 (6th Cir. 2010) (internal quotations omitted). Under this standard, "[c]ounsel's choices between alternative courses is evidence of adverse effect only if it is not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland*." *Id.* at 632 (internal quotation omitted).

2.    *Analysis*

The Michigan Court of Appeals rejected petitioner's joint representation claim, reasoning that petitioner and his wife "did not raise, either before or during trial, any concerns pertaining to their joint representation by counsel," and that there was "no demonstrable conflict of interest." *Hardy*, 2011 WL 4810772, at *4. The court explained that "their testimony and trial strategy were not in conflict and, although minor discrepancies may have existed in their testimony, overall their positions and theories of the case completely coincided." *Id.* This determination was reasonable.

As the court of appeals observed, the charges against petitioner and his wife were identical, based upon their joint actions in keeping the house and disciplining the children. They offered an identical defense to the charges, denying the allegations of the victims. Petitioner does not suggest that counsel should have pursued any other defense but failed to do so because of counsel's representation of his wife. Nor does petitioner point to any evidence harmful to him that counsel introduced, or beneficial to him that counsel failed to introduce, based on counsel's representation of his wife. The legal interests of petitioner and his wife were completely aligned at trial, and petitioner has failed to point to any "specific instances in the record to suggest an actual conflict or

33

impairment of his interests." *McElrath*, 595 F.3d at 631. Thus, the Michigan Court of Appeals's rejection of this claim was reasonable. *See, e.g.*, *United States v. Robaina*, No. 13–20346–CR, 2013 WL 3243368, at *10 (S.D. Fla. June 26, 2013) ("Cases involving married couples who are criminal defendants in the same prosecution are in significant ways different than multi-defendant cases involving strangers or defendants whose only common thread is the alleged criminal activity. The Robainas are married. They have children together. They are charged in connection with the filing of joint tax returns. Their interests, both in life and in this case, are largely aligned. . . .  To be sure, there may well be situations where a husband and wife cannot knowingly and intelligently waive their rights to conflict-free counsel, and there may well be cases where courts should reject waivers from a married couple. But this is not one of those cases. In fact, it is not unusual for courts to approve waivers from husbands and wives named as co-defendants in federal criminal cases."); *Dixon v. State*, 758 So. 2d 1278, 1280-81 (Fla. Ct. App. 2000) (no conflict arising from joint representation of husband and wife in drug trial where both claimed innocence, they did not present contradictory or inconsistent defenses, and there were no great differences in the weight of the evidence against them); *People v. Sambo*, 554 N.E.2d 1080, 1089 (Ill. Ct. App. 1990) (no conflict arising from joint representation of husband and wife in child abuse trial where victim's allegations were made against them jointly, both denied the charges, and they did not have any conflicting or antagonistic defenses).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Motion for Bond*

Also pending before the Court is petitioner's motion for bond, in which he seeks release on bonding pending the Court's resolution of his habeas petition.  Petitioner contends that release on

34

bond is appropriate because his claims are meritorious, he has served beyond his minimum sentence, and he would have had a good chance for parole but for the fact that he was unwilling to incriminate himself by accepting responsibility before the Parole Board. The Court should conclude that petitioner is not entitled to release on bond.

"It is recognized that a federal district court has inherent authority to release an inmate on bail or surety pending the court's decision on a petition for writ of habeas corpus." *Johnson v. Nelson*, 877 F. Supp. 569, 570 (D. Kan. 1995) (citing cases). *But cf. In re Roe*, 257 F.3d 1077, 1079 (9th Cir. 2001) (recognizing split in authority as to whether habeas court may order release on bond pending the district court's resolution of the petition). However, because a habeas petition challenges a valid, final state court judgment, principles of federalism and comity require a federal habeas court to tread lightly before interfering with a state's execution of a valid sentence by ordering release on bond. *See Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988); *cf. Cherek v. United States*, 767 F.2d 335, 337-38 (7th Cir. 1985) ("A defendant whose conviction has been affirmed on appeal . . . is unlikely to have been convicted unjustly; hence the case for bail pending resolution of his postconviction proceeding is even weaker than the case for bail pending appeal. And the interest in the finality of criminal proceedings is poorly served by deferring execution of sentence till long after the defendant has been convicted."). Thus, a district court's power to order release pending disposition of an application for habeas relief is "limited" and properly exercised in "special cases only." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). In order to be entitled to release pending disposition, a habeas petitioner must make two showings. First, he must show that his petition raises substantial constitutional questions on which he is likely to prevail. Second, he must show that "extraordinary or exceptional circumstances exist which either warrant the requested

relief or require release to make the writ of habeas corpus an effective remedy." *Johnson*, 877 F. Supp. at 570; *accord Mapp*, 241 F.3d at 226; *Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986).[4]

Here, for the reasons explained above, petitioner has not shown a substantial probability of success on the merits of his claims. Further, he has failed to demonstrate any special circumstances justifying the extraordinary relief of release on bond. In order to make this showing, petitioner must demonstrate that his case is "distinguishable from other habeas cases." *Rado*, 699 F. Supp. at 26. The situations in which extraordinary circumstances will be found "seem to be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992). Petitioner's claim of constitutional error in his trial does not present an extraordinary circumstance, as "there is nothing unusual about a claim of unlawful confinement in a habeas proceeding." *Martin*, 801 F.2d at 330. Nor does petitioner's claim that he is actually innocent amount to an extraordinary circumstance; a habeas petitioner "comes before the court with a strong–and in the vast majority of cases conclusive–presumption of guilt." *Schlup v. Delo*, 513 U.S. 298, 326 n.42 (1995). In short, petitioner has "made no showing of a medical emergency or any other special circumstance" justifying release on bond. *Martin*, 801 F.2d at 330. Thus, he is not entitled to be released on bond pending the Court's disposition of his application for the writ of habeas corpus. *See Roe*, 257 F.3d at 1080-81 (petitioner not entitled to release on bond despite failing health, the seriousness of the allegations in the petition, petitioner having a place to

---

[4]A separate set of standards applies when bond is sought after the district court has adjudicated the petition, either granting or denying relief on the merits. *See Hilton v. Braunskill*, 481 U.S. 770 (1987); FED. R. APP. P. 23(b), (c). These separate standards are inapplicable where, as here, a petitioner seeks bond prior to the district court's adjudication of the petition. *See United States v. Stewart*, 127 F. Supp. 2d 670, 672 (E.D. Pa. 2001).

reside, and codefendant's statement that petitioner was not involved in the crime); *Landano*, 970 F.2d at 1240-41 (petitioner not entitled to release on bond despite making strong showing of actual innocence, lack of state court provisions for bond during post-conviction proceedings, and no risk of flight).

G.      *Recommendation Regarding Certificate of Appealability*

        1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893

n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should likewise conclude that petitioner is not entitled to a certificate of appealability.  As explained above, even if counsel was deficient for failing to interview and call witnesses, the Michigan Court of Appeals's conclusion that petitioner could not show prejudice is not reasonably debatable.  Neither Richard nor the other proposed witnesses could have testified to what happened at the home outside their presence.  Further, Richard's testimony was largely contradicted by the

38

physical evidence and by the testimony of petitioner and his wife. Thus, the court of appeals's rejection of this ineffective assistance of counsel claim is not reasonably debatable. Further, as explained above, there is no question that there existed no basis, either under Michigan law or under the Due Process Clause, for severance of petitioner's trial from that of his wife. Thus, the conclusion that counsel was not ineffective for failing to seek severance is not reasonably debatable. Finally, because petitioner and his wife did not have any conflicting interests in defending against the charges, and because petitioner has pointed to no specific facts in the record showing such a conflict, the court of appeals's conclusion that counsel did not act under a conflict that adversely affected his representation of petitioner is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

H.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability. Finally, the Court should deny petitioner's motion for bond.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*,

932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Date: January 29, 2014                                        s/Paul J. Komives
                                                             PAUL J. KOMIVES
                                                             UNITED STATES MAGISTRATE JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 29, 2014.

                                                             s/ Kay Doaks
                                                             Case Manager

40